Ruth C. **JONES**, Plaintiff,

v.

Kenneth S. **APFEL**, Commissioner of Social Security, Defendant.

No. 98 CIV. 3389(WHP).

United States District Court, S.D. New York.

Sept. 20, 1999.

---

Ian F. Feldman, Legal Aid Society, Bronx, NY, for Plaintiff.

Susan Baird, Assistant U.S. Attorney, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

The plaintiff, Ruth Jones ("Jones") brings this action against the Commissioner of Social Security ("Commissioner") pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), seeking review of a final decision denying her disability benefits. This matter was referred to a magistrate judge. Both parties moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. The magistrate judge recommended that the plaintiff's motion for judgment on the pleadings be granted to the extent of remanding the action to the Commissioner to further develop the record, and that the Commissioner's motion for judgment on the pleadings be denied. Neither party filed objections to the magistrate judge's report and recommendation ("Report").

After a de novo review, this Court agrees that the ALJ failed to adequately develop the record in reaching his determination of Jones' residual functional capacity, and thus adopts the magistrate judge's report.

## BACKGROUND

### Prior Proceedings

On March 8, 1994, Jones applied for Social Security Supplemental Security Income ("SSI") benefits on the basis of psychiatric problems, diabetes and joint pain. (R. 41–44.)[1] That application was denied on August 17, 1994. Jones' request for reconsideration on the basis of physical and mental disability was subsequently denied on May 24, 1995. (R. 77–80.) On February 12, 1996, Jones appeared pro se at a hearing before an Administrative Law Judge ("ALJ"). On June 20, 1996, the ALJ found that Jones was not disabled under the Social Security Act because she retained the residual functional capacity to return to her previous work, or to engage in other work which exists in the national economy. (R. 9–16.) On February 5, 1998, the Appeals Council denied Jones' request for a review of the ALJ's decision, rendering the ALJ's decision final. (R. 4.) On March 25, 1998, Jones, represented by the Legal Aid Society, commenced this action under Section 205(g) of the Social Security Act.

### Testimony at the Hearing

Jones was born on March 1, 1945. At the time of the hearing, she had achieved an eleventh grade education. She was taking Impurity 100 Insulin for her diabetes, and Duptap (phonetic) for her nerves. At the time of the hearing, Jones was living with her cousin, Cora Tapp, for a few months. (R. 23, 27, 31, 33.) Jones testified that she experienced daily episodes of weakness, falling, painful arthritis, sudden blackouts, unexplained weight loss, and blurry vision. (R. 27–30.) Jones testified that she had been treated for her diabetes during 1994 and 1995 by Dr. Coven at the Soundview Health Clinic, but that she was presently looking for another physician. (R. 31, 35.) She testified that she was treated for her arthritis by Dr. Coven as well, but had stopped treatment

---

1. "R." followed by page numbers refers to the pages of the certified administrative record filed by the Commissioner as part of his Answer.

since she left the Soundview Health Clinic. (R. 29.) She also stated that she was being treated for "her nerves" by a psychiatrist at Bronx Mental Health Services. (R. 30.) The record reveals that Jones started receiving treatment from the psychiatrist in February 1996. (R. 23.) Jones also stated that she had last worked as a home attendant for an elderly woman in 1983. (R. 26.) This job involved bathing the woman, as well as shopping and cooking for her. It also involved lifting the elderly woman whom Jones described as "very heavy." (R. 27.)

Jones' cousin, Cora Tapp, ("Tapp") with whom she lived, also testified at the hearing. She stated that Jones had lost considerable weight, and that she needed help with routine daily activities, such as grocery shopping, and running errands. (R. 33.) She also corroborated Jones' testimony regarding her sudden blackouts, adding that it would be necessary to place a piece of candy under Jones' tongue to revive her during a those times. (R. 35 .)

*Documentary Evidence*

In reaching his decision, the ALJ relied on four patient notes signed by Dr. A. Egbunike from Bronx Lebanon Family Practice Center ("Bronx Lebanon"), and an x-ray report by Dr. J.C. Tourlitsas, also from Bronx Lebanon. The first patient note, dated February 24, 1994, indicated that Jones had a history of depression for the past four years, and recommended iron sulphate for her anemia. (R. 125.) The second patient note, dated March 1, 1994, diagnosed her with "uncontrolled" diabetes and reflected that she was being treated for depression with Hydroxyzine. The x-ray report, dated March 2, 1994, indicated that Jones suffered from hypertension and diabetes. (R. 129.) However, her heart, lung and pleuro-diaphragm were normal. (R. 129.) The third patient note, dated March 29, 1994, stated that while Jones' hypertension was under control, her diabetes remained uncontrolled. (R. 124) The fourth patient note, dated April 27, 1994, stated that Jones' diabetes appeared to be

controlled, that her hypertension was well-controlled, and that she was still seeing a psychiatrist and being treated with Hydroxyzine. The note also recommended that Jones continue to take iron sulphate for her anemia. (R. 123.)

The ALJ also reviewed three consultative physical examination reports, conducted on behalf of the Commission, dated March 4, 1994, July 1, 1994 and April 18, 1995, and three consultative psychiatric examination reports, dated March 8, 1994, July 1, 1994 and April 18, 1995. In addition, the ALJ considered two residual functional capacity assessments, dated August 24, 1994 and May 10, 1995.

*The ALJ's Decision*

At the conclusion of the hearing, the ALJ asked Jones to obtain three medical reports: a physical report from Dr. Coven of the Soundview Health Clinic, where Jones had been treated during 1994 and 1995; a physical report from Dr. Walsh of Bronx Lebanon, and a mental report from the Bronx Mental Health Services. (R. 36–38.) The ALJ specifically stated that Dr. Coven from Soundview Health Clinic would be considered Jones' treating physician. (R. 25.) He also acknowledged both Dr. Walsh and the unidentified psychiatrist examined Jones only once, and thus, might not "be in a position to give a report if they've only seen [Jones] once or twice." (R. 25.)

The ALJ encouraged Jones' cousin to help her get the reports, and instructed Jones that if he did not hear from her in thirty days, he would "consider the record closed." (R. 38.) At the expiration of the thirty days, the ALJ wrote to Jones, stating that if he did not hear from her within ten days, he would "issue a decision." (R. 160.)

On June 20, 1996, the ALJ issued a decision denying Jones' SSI benefits, based on a finding that she was not disabled within the meaning of the Social Security Act. (R. 9–16.) Despite the absence of any records from Jones' treating

physician, Dr. Coven, the ALJ found that "the record contained ample medical evidence and that a decision could be made as to whether the plaintiff was disabled." (R. 12.) He also found that Jones retained the residual functional capacity to return to her past work as a home attendant, or other work which exists in the national economy. (R. 16.) In reaching his decision, the ALJ relied on the patient notes from Bronx Lebanon, to show that Jones' diabetes, hypertension and anemia were controllable as long as she adhered to her prescribed medication. The ALJ also relied on the consultative examinations to support his finding as to Jones' residual functional capacity.

*Medical Evidence Submitted to the Appeals Council*

On August 15, 1996, Dr. Walsh submitted a report, dated August 14, 1996, to the Appeals Council. (R. 161–68.) The report stated that a physical examination of Jones conducted on August 9, 1996, was normal, except for an enlarged liver and anemia. (R. 163.) Dr. Walsh found that Jones could stand, walk, lift and carry, despite her impairments. He also found that she could occasionally carry up to 20 pounds a day and that she could sit for eight hours a day; and for three hours without interruption. (R. 167.) Dr. Walsh also found that Jones could occasionally climb, kneel, crouch, stoop, balance and crawl, and that her impairments did not prevent her from reaching, handling, speaking, feeling, pushing, pulling or hearing. (R. 167.) The only environmental limitation on working noted by Dr. Walsh, was the minimization of temperature extremes. (R. 168.)

## DISCUSSION

*Standard of Review*

This Court conducts a de novo review of the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In deciding a motion for judgment on the pleadings, the court may consider only the factual allegations in the complaint and answer. Fed.R.Civ.P. 12(c). A party is entitled to judgment on the pleadings only if it establishes that no material facts remain to be resolved, and that it is entitled to judgment as a matter of law. *See Carballo v. Apfel,* 34 F.Supp.2d 208, 213 (S.D.N.Y.1999) (*citing Juster Assocs. v. Rutland,* 901 F.2d 266. 269 (2d Cir.1990)).

The Social Security Act provides that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." *See* 42 U.S.C. § 405(g); *see also Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Reynoso v. Apfel,* 1998 WL 61002, at *6, 1998 U.S. Dist. LEXIS 1549, at *17 (S.D.N.Y.1998). "Substantial evidence" in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)(*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995).

In determining whether the Commissioner's conclusions are supported by substantial evidence, the reviewing court "must first be satisfied that the claimant has had a full hearing under the Commissioner's regulations and in accordance with the beneficent purposes of the Act." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990). Moreover, the Act must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits. *Id.*

*Applicable Law*

In evaluating disability claims, the Commissioner is required to use the five-step process promulgated in 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. Second, if the claimant is

not so engaged, the Commissioner must determine whether the claimant has a "severe impairment" which significantly limits his ability to work. Third, if the claimant does suffer such an impairment, the Commissioner must determine whether it corresponds with one of the conditions presumed to be a disability by the Social Security Commission. If it does, then no further inquiry is made as to age, education or experience, and the claimant is presumed to be disabled. If the impairment is not the equivalent of a condition on the list, the fourth inquiry is whether the claimant is nevertheless able to perform his past work. If he is not, the fifth and final inquiry is whether the claimant can perform any other work. The burden of proving the first four elements is on the claimant, while the burden of proving the fifth element is on the Commissioner. *See Felicie v. Apfel,* 1998 WL 171460, at *2, 1998 U.S. Dist. LEXIS 5068, at *4 (S.D.N.Y.1998) *(quoting Bush v. Shalala,* 94 F.3d 40, 44–45 (2d Cir.1996)). The Commissioner satisfies his burden at the fifth step by resorting to the applicable vocational guidelines/grids. 20 C.F.R. Pt. 404, Subpt. P., App. 2 (1986). Although the grid results are generally dispositive, exclusive reliance on them is inappropriate where the guidelines fail to describe the full extent of the claimant's physical limitations. *Montes–Ruiz v. Chater,* 1997 U.S.App. LEXIS 32217, at *78 (2d Cir. 1997).

■ In addition, in determining whether a claimant is disabled, the Commissioner must consider: 1) objective medical facts and clinical findings; 2) diagnoses and medical opinions of examining physicians; 3) the claimant's subjective evidence of pain and physical incapacity as testified by himself and the individuals who observed him; and 4) the claimant's age, educational background, and work history. *Brunson v. Apfel,* 1998 WL 557593, *4, 1998 U.S. Dist. LEXIS 13551, at *10 (S.D.N.Y.1998)*(quoting Carroll v. Secretary of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

*Analysis*

■ In this action, the magistrate judge found that the ALJ failed to assist Jones in obtaining the medical reports of her treating physicians, Dr. Coven at Soundview Health Clinic, Dr. Walsh at Bronx Lebanon, and the unidentified psychiatrist at Bronx Mental Health Services. *Report* at 32. Recognizing the ALJ's affirmative duty to obtain medical evidence from a plaintiff's treating physician, the magistrate judge found that the ALJ had failed to adequately develop the record, and recommended that the action be remanded to the Commissioner for further fact-finding. *Id.* This Court adopts the report and recommendation of the magistrate judge with respect to Dr. Coven, but does not agree that Dr. Walsh from Bronx Lebanon and the psychiatrist from Bronx Mental Health Services are treating physicians.

*Developing the Record*

It is well settled in this Circuit that the ALJ, unlike a judge at trial, must affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding. *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999) (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996.) (quoting *Echevarria v. Secretary of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982))). Under the regulations, the Secretary must develop the plaintiff's "complete medical history," and make "every reasonable effort" to help the plaintiff get the required medical reports. 20 C.F.R. § 404.1512(d). "Every reasonable effort" has been defined by the regulations to require an initial request for medical evidence from the medical source, and a follow-up request, followed by a ten-day extension, if the requested evidence has not been received within ten to twenty calendar days. 20 C.F.R. § 404.1512(d)(1).

However, in cases involving pro se plaintiffs, this affirmative duty is heightened.

**524**

*See Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). The ALJ must take all reasonable steps to obtain past and current medical evidence and assessments from treating sources identified by a pro se plaintiff, in order to complete the administrative record. *Almonte v. Apfel,* 1998 WL 150996, at *4, 1998 U.S. Dist. LEXIS 4069, at *11 (S.D.N.Y.1998). "Reasonable efforts" in this context entails more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the plaintiff of the importance of the evidence. *Id.* 1998 WL 150996, at *7, 1998 U.S.Dist LEXIS at *20–21. The ALJ must also enter these attempts at evidentiary development into the record. *Id.* 1998 WL 150996, at *4, 1998 U.S.Dist LEXIS at *11–12.

In this action, the administrative record lacks any medical report from Dr. Coven, Jones' treating physician. The ALJ failed to issue a subpoena to Dr. Coven. *See Almonte,* 1998 WL 150996, at *4, 1998 U.S. Dist. LEXIS 4069, at *11. The ALJ also neglected to ask Jones any questions about her psychiatric condition or how it affected her ability to work. In *Bosmond v. Apfel,* 1998 WL 851508, 1998 U.S. Dist. LEXIS 19078 (S.D.N.Y.1998), the court noted that remand would be appropriate where the ALJ disregarded the plaintiff's testimony or medical evidence, and simultaneously failed to inquire further into facts that could support the plaintiff's contentions. Remand would also be appropriate where the ALJ's neglect in pursuing information led to gaps in the record. *Id.* 1998 WL 851508, at *9, 1998 U.S.Dist. LEXIS at *29.

Here, the ALJ failed to obtain Dr. Coven's report, even though it would have provided relevant information about Jones' medical condition. The magistrate judge stated that the ALJ left it entirely to the plaintiff to obtain the necessary reports. *Report* at 32. Although the ALJ complied with the minimum requirements of the regulations by re-contacting Jones and giving her a ten-day extension, this approach is insufficient to satisfy the heightened duty required for pro se plaintiffs. The ALJ then issued a decision based solely on consultative medical evaluations and his own subjective observations of Jones in court, without affording Jones the benefit of medical records from her treating physician, or according her testimony any weight.

Such omissions have formed a basis for remand in the past. *See Schaal v. Apfel,* 134 F.3d 496 (2d Cir.1998). In *Schaal,* the plaintiff's case was remanded because the ALJ made no effort to obtain medical records from a physician identified by the plaintiff as her treating physician during the relevant time. *Id.* at 499. *See also Montes–Ruiz v. Chater,* 1997 U.S.App. LEXIS 32217 (2d Cir.1997) (ALJ did not adequately develop the record when he failed to obtain reports from medical facilities where claimant had been treated for back problems.) Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is appropriate. *Rosa v. Callahan,* 168 F.3d 72, 82 (2d Cir.1999) (*quoting Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996)(*quoting Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980))).

In this case, Dr. Coven was treating Jones at the time she first applied for SSI benefits in 1994, and continued treating her through 1995, for the condition alleged in her application. It was incumbent upon the ALJ to actively seek out medical reports from him. The magistrate judge was correct in finding that such an omission simply cannot result in a "well-supported" finding that Jones was not disabled under the Social Security Act.

*Treating Physician Rule*

Although the term "treating physician" is not defined in the Social Security Act, *Coty v. Sullivan,* 793 F.Supp. 83, 85 (S.D.N.Y.1992), the Second Circuit defined the term in *Schisler v. Bowen,* 851 F.2d 43

(2d Cir.1988). A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." *Id.* at 47. Having treated Jones' diabetes for two years on an ongoing basis, Dr. Coven falls within this definition. Because Dr. Walsh from Bronx Lebanon, and the psychiatrist at Bronx Mental Health Services had examined Jones only once, they lacked an ongoing physician-patient relationship with her and therefore do not fall within the definition of "treating physician". Although the ALJ acknowledged that Dr. Walsh and the psychiatrist "might not be in a position" to submit reports on Jones, (R. 25), the magistrate judge identified them as treating physicians. (Report at 32). This Court disagrees with that finding and therefore does not adopt the magistrate judge's report with respect to Dr. Walsh and the psychiatrist.

 The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with substantial evidence. *Rosa v. Callahan* 168 F.3d 72, 78 (2d Cir.1999) (*quoting Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (*citing* 20 C.F.R. § 404.1527(d)(2)))). Section 223(d)(5) of the Social Security Act requires that the Secretary attempt to obtain medical evidence from the treating physician *prior to evaluating medical evidence obtained from any other source on a consultative basis.* [Emphasis added.] 42 U.S.C. § 423(d)(5). The Second Circuit held these regulations to be binding on the courts. *Schisler v. Sullivan,* 3 F.3d 563 (2d Cir.1993). The ALJ was therefore obligated not only to obtain the treating physician's reports, but to do so prior to evaluating the reports of the consultative physicians. In this case, the ALJ failed to do this.

*New Evidence*

Dr. Walsh's report, dated August 14, 1996, was submitted as new evidence to the Appeals Council. Additional evidence submitted to the Appeals Council is part of the administrative record. *See Perez v. Chater,* 77 F.3d 41, 45 (1996); *see also* 20 C.F.R. §§ 404.970(B), 416.1470(B). Although Dr. Walsh's report supports the ALJ's decision, Walsh's report is not indicative of Jones' condition for the entire relevant period for which she applied for benefits. Alleging that her disability began on January 1, 1994, Jones applied for SSI benefits on March 8, 1994, more than two years prior to Dr. Walsh's report. Thus, the reports of Dr. Coven, are indispensable.

### CONCLUSION

For the reasons set forth, this Court adopts the report of the magistrate judge, remanding the action to the Commissioner for further fact-finding in accord with this order. Jones' motion for judgment on the pleadings is granted to the extent of the remand, and the Commissioner's motion for judgment on the pleadings is denied.

SO ORDERED.

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Plaintiff Ruth Jones brings this action, pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny her disability benefits. Both parties have cross-moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Although Jones was not represented by counsel before the Commissioner, she is represented in this proceeding by the Legal Aid Society.

For the reasons set forth below, because the Administrative Law Judge failed to adequately develop the medical record, particularly concerning Jones's psychiatric

treatment, I recommend that the Court grant Jones's motion for judgment on the pleadings to the extent of remanding to the Commissioner to further develop the record, and deny the Commissioner's motion.

### PROCEDURAL BACKGROUND

On March 8, 1994, Jones applied for Social Security Supplemental Security Income ("SSI") benefits on the basis of psychiatric problems, diabetes and joint pain. (Administrative Record filed by the Commissioner [hereafter, "R."], at 41–44.) Jones's application was denied on August 17, 1994. (R. 63–66.) Jones's request for reconsideration, on the basis of physical (disability and pain) and mental disability (R. 67), was denied on May 24, 1995. (R. 77–80.) At Jones's request (R. 81), a hearing was held before an administrative law judge ("ALJ") on February 12, 1996. (R. 18–40.) Jones was not represented by an attorney at that hearing. (R. 20–21.) On June 20, 1996, the ALJ issued his decision finding that Jones was not disabled. (R. 9–17.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Jones's request for review on February 5, 1998. (R. 4–6.) This action followed.

### FACTS

#### A. *The Hearing Before the ALJ*

On February 12, 1996, the ALJ held a hearing on Jones's SSI application. (R. 18–40.) Jones and her cousin, Cora Tapp, testified. (*Id.*) At the time of the hearing, Jones was 50 years old. (R. 26 .)

#### 1. *Jones's Request for Counsel and Her Decision to Proceed Without Counsel*

At the commencement of the hearing, the ALJ noted that Jones appeared pro se and asked if she wanted an attorney. (R. 20.) Jones said yes, and then was essentially talked out of it by the ALJ:

ALJ: You're here today without a representative and typically a representative is an attorney. Do you understand that you have the right to have an attorney?

CLMT [JONES]: Yes.

ALJ: *And do you wish to have an attorney here?*

[JONES]: *I wouldn't mind.* When I called them, you know, they told me that today was the only day I could get so I told her if I got out I would call her and make an appointment with her today because—

ALJ: Well, who are you referring to when you say—

[JONES]: Legal aid lawyer.

ALJ: A legal aid lawyer?

[JONES]: Yes.

. . . .

ALJ: *So you want to have an attorney?*

[JONES]: *Yes, if I need one, yes, sir.*

ALJ: *Well, it's not a question of your needing it, but the issue is you have your right to have an attorney.*

[JONES]: *Oh, okay. I'll just go on here without one.*

ALJ: Well, let's back up here a moment. . . . You have the right to have an attorney present here today. You can give up that right to have an attorney present. That was all explained to you in the notice of hearing.

[JONES]: Yes.

ALJ: If you give up the right to have an attorney present, that's one option. If you tell me that you've spoken to legal aid, for example, and you need more time to get an attorney lined up so to speak for a hearing, then I'll give you an adjournment because this is the first time you've been here. That decision is yours.

[JONES]: Oh, I'll go with it, okay.

ALJ: You want to go forward now?

[JONES]: Yes, sir.

ALJ: And you're giving up the right to have an attorney present?

[JONES]: Yes, sir.

(R. 20–21, emphasis added.)

### 2. The ALJ's Questioning of Jones To Identify Her Treating Physicians

The ALJ asked Jones if she was still seeing Dr. Coven, whom Jones had named on her list of medications. (R. 22.) When Jones said she was no longer seeing Dr. Coven, the ALJ dropped the subject and began asking Jones what doctor she currently was seeing. (R. 22.) Jones stated that the prior week she began seeing Doctor Walsh, a physician, and also a psychiatrist at Bronx Mental Health Services, who prescribed medication "to calm [her] down." (R. 23–24.) The ALJ never followed up on this statement, and never asked Jones about her psychological claim or condition.

The ALJ asked Jones where she had been treated previously. (R. 24 .) Jones said "Sometimes I had to end up going to the hospital because when my diabetes get out of control. Just different hospitals. It's been so long, you know, I can't remember the dates." (R. 24.) Jones testified that she had been treated at Soundview Health Clinic since 1979:

> CLMT [JONES]: Well, that's the other doctor that took my records from there because I've been going there since '79.
>
> ALJ: Where?
>
> [JONES]: Soundview.
>
> ALJ: For example, in 1995, where were you treated?
>
> [JONES]: I wasn't because I was over across town. He had gave me medications to last me.
>
> ALJ: Where were you treated in 1995? That's last year.
>
> [JONES]: Soundview.
>
> . . . .
>
> ALJ: Do you know the full name?
>
> [JONES]: Soundview Health Clinic.
>
> ALJ: And what were you treated there for?
>
> [JONES]: Diabetes mainly.

> ALJ: That was your only source of treatment?
>
> [JONES]: Yes.
>
> ALJ: What about in 1994, where were you treated?
>
> [JONES]: Same place.
>
> ALJ: *Do you have a report from Soundview for me?*
>
> [JONES]: *No, I don't. I can get one though.*
>
> ALJ: *All right. I'm also going to ask you to get reports from Bronx Lebanon and the Bronx Mental Health Services recognizing that they may not be in a position to give a report if they've only seen you once or twice. So the evidence from your treating source would be from Soundview from 1994 and 1995.*
>
> [JONES]: Okay.

(R. 24–25, emphasis added.) The ALJ gave Jones medical report forms and medical functional capacity assessment forms for Bronx Lebanon, Bronx Mental Health Services, and Soundview, and a mental capacity assessment form for Bronx Mental Health Services. (R. 25.) The ALJ asked Jones if she had ever been treated for mental illness at Soundview, and Jones replied "No." (R. 25–26.)

At the conclusion of the hearing, the ALJ reminded Jones and her cousin that he needed reports from Soundview, Bronx Lebanon and Bronx Mental Health Services. (R. 36–38.) The ALJ "mark[ed] it for 30 days," and said that if he did not hear from Jones, he would consider the record closed, and if he did not receive anything he would not contact Jones. (R. 38–39.) The ALJ said that since Jones had a right to see any medical reports sent to the ALJ, he would notify her if he received any reports. (R. 38–39.)

The ALJ never told Jones why the records were necessary, and never offered to procure the records himself.

### 3. The Testimony of Jones and Her Cousin About Jones's Medical Condition

Jones testified that she had an eleventh grade education. (R. 26.) She last worked in 1983 for a year as a home attendant for an elderly woman. (*Id.*). Jones bathed the woman, shopped and cooked for her. (*Id.*) Jones also had to lift the woman, who was "very heavy." (*Id.*) The only other work Jones performed since 1983 was occasional baby-sitting for friends. (R. 27.)

At the time of the hearing, Jones was living with her cousin, Cora Tapp, and had lived with her for the past couple of months. (R. 23, 27, 31, 33.) Jones testified that she was unable to work "because I can't even go shopping for myself because I get very weak. Sometimes I even fall. That's why I'm with my cousin because I don't do well by myself." (R. 27.) Jones did not know why she was weak, but was changing doctors in the hopes of finding out. (*Id.*) Jones explained that the weak feeling "will just come on me and like down, I go down. I can start getting nervous like I'm going to pass out or something." (*Id.*) Jones experienced the weakness from her waist down to her feet "[p]ractically every day," "[a]bout twice a day" for "at least . . . 30 minutes," for the last three years (R. 27–29.) When a "weakness episode" came upon her, Jones would "have to sit down" and if it came back again she would lie down, until it wore off by itself. (R. 28.) Jones was taking iron pills for the weakness, but they did not help. (R. 29.)

Jones's only other complaint was arthritis in her left shoulder and knee, which "hurts a lot." (R. 28.) The arthritis pain began three years prior to the hearing, about the same time the weakness began, and she suffered from the pain "[m]aybe twice a week," in damp weather. (R. 28, 29.) Sometimes the pain "lasts all night." (R. 29.) Dr. Coven of Soundview had treated Jones for arthritis, but since she stopped going to Soundview, she was just taking Tylenol for the pain, and the "Tylenol does it no good." (*Id.*)

Jones testified to complications from her diabetes: about three times a week "sometimes my eyes get real blurry and my feet do like—it tingles and so is my hands." (R. 30.) These feelings would last about 35 minutes and there was nothing she could do to make them go away. (*Id.*) Jones testified that when she got these feelings, she would test her sugar but the levels were normal. (R. 31.) Jones was being treated by Dr. Coven of Soundview for her diabetes. (*Id.*)

At the time of the hearing, Jones was taking Impurity 100 Insulin for her diabetes, prescribed by Dr. Coven, and Duptap (phonetic) for her nerves, which her psychiatrist from Bronx Mental Health prescribed. (R. 29–31.)

The ALJ asked Jones if she had "any other problems," and Jones replied "No." (R. 31.)

The ALJ asked Jones to describe her day-to-day life. (R. 31.) Jones stated that she spent most of her time "watching T.V." and "[w]hen [she] get[s] tired of that [she] look[s] out the window." (*Id.*) She did not do any reading. (R. 32.) Jones and her cousin shared the cooking and the cleaning. (R. 31.) Tapp did the laundry and the shopping, but Jones sometimes would go along with her. (R. 32.) Jones said that she was able to walk about two blocks without stopping if she was lucky, after which she would have to stop and rest because her legs get tired. (*Id.*) Jones said she could lift about 15 pounds. (*Id.*) She could not sit for more than 20 minutes at a time because she "get[s] very impatient." (*Id.*)

After Jones testified about her daily life, the ALJ asked Jones "is there anything else that you want to bring to my attention, ma'am," and Jones replied, "No, sir, that's it." (*Id.*)

The ALJ asked Tapp to tell him about Jones's condition. Tapp responded that:

[Jones has] been living with me off and on because she goes home and comes back, but she's been staying with me for about the last couple of months now.... I do go out with [Jones], help her with her shopping and do her little welfare stuff when she get it. And she's very weak in [her] legs. She'll be falling out in the floor. That's one reason why she stays with me, too, because, you know, she's very weak ...—and she's losing a[lot] of weight. I don't know what it's coming from.... [M]ostly all day she'll be having those falling down spells like, like she can't—and I'll be going with her shopping mostly and mostly doing her things that's got to be done.

(R. 33–34.) Tapp had seen Jones fall "two or three times" since they had been living together. (R. 34.) About once a month, Jones would black out for a couple of minutes. (*Id.*) When Jones blacked out, Tapp would put "some candy in [Jones's] mouth or ... wipe her with a damp rag." (R. 35.)

The ALJ asked Jones if she had lost weight, and Jones replied that she lost about 15 pounds in the last three months. (R. 35–36.) Jones said she told Dr. Coven about the weight loss but he did not say anything. (R. 36.)

The ALJ then asked Jones, "Is there anything else that you wanted to bring to my attention?," and Jones replied, "That's mostly it." (*Id.*)

## B. *The Medical Evidence*

### 1. *Treating Physician Notes*

There were no treating physician evaluations from Soundview or Bronx Mental Health before the ALJ, but the ALJ did have patient notes from Bronx–Lebanon from February, March and April 1994. (R. 123–29.)

The Bronx–Lebanon patient notes dated February 24, 1994 from Jones's first visit state that Jones had a history of depression for 4 years. (R. 125.) The next note, dated March 1, 1994, states that Jones's

diabetes was "uncontrolled," and that Jones was taking Hydroxyzine for her depression, which stemmed from her son's murder. (R. 127.) On March 2, 1994, Dr. J.C. Tourlitsas of Bronx–Lebanon diagnosed Jones with hypertension and insulin dependent diabetes mellitus, but Jones's heart, lungs and pleuro-diaphragm were normal. (R. 129.) The notes dated March 29, 1994 stated that Jones's diabetes was still uncontrolled, though her hypertension was "well controlled." (R. 124.) As to her depression, Jones was noted as going to a "Psych Day Clinic." (*Id.*) The last Bronx–Lebanon patient note before the ALJ, dated April 27, 1994, reported that Jones's diabetes "appear[ed] controlled," her hypertension continued to be "well controlled" and she was still going to the psychiatric day clinic and taking Hydroxyzine for her depression. (R. 123.)

### 2. *Consultative Physical Examinations*

On March 4, 1994, Dr. Daisy Urbano, an internist from HS Systems, Inc., examined Jones, as a consultative examiner on behalf of the Commissioner. (R. 107–10.) Dr. Urbano noted on the Medical History Questionnaire that Jones's "Chief Complaint" was "Psychiatric problems." (R. 107.) Dr. Urbano noted that Jones reported high blood pressure for which she took Capoten; she had diabetes for which she took insulin and depression for which she took Hydroxyzine; and she had arthritis in the left knee but the knee was not swollen and she had no limitations as a result of the arthritis. (R. 107–09.) Dr. Urbano found that Jones had insulin dependent diabetes mellitus which "needs better control," joint pain in her left knee, mild hypercholesteremia, and decreased visual acuity. (R. 110.) Dr. Urbano assessed Jones' psychiatric state as "[p]sychiatric disorder, marked functional impairment," and referred her for a psychiatric evaluation. (R. 109–10, 113.) Dr. Urbano diagnosed Jones as "[p]ermanently [d]isabled"

as a result of Jones's impaired psychiatric state. (R. 113; *see also* R. 110.)

Dr. Urbano's colleague from HS Systems, Dr. Benjamin Glibi, also examined Jones on March 4, 1994. (R. 114–17.) He noted that Jones was taking 25 mg Hyroxizine twice a day and at night for her depression, and that she had attempted suicide in 1990. (R. 114.) He noted that Jones said she was presently seeing a psychiatrist. (*Id.*) Dr. Glibi found that Jones had abnormal musculoskeletal and endocrine systems as well as abnormal mental disorders. (R. 115.) Dr. Glibi assessed Jones as generally "in no acute distress." (*Id.*) Jones "is oriented. Memory appears adequate. Communication is adequate with no impairment of speech.... Patient walks normally.... Patient is able to dress and undress without difficulty. Patient is able to get on and off examination table without difficulty." (*Id.*) Dr. Glibi also found that Jones had "decreased range of motion in the left knee. Flexion of the right knee is 120° and the left knee is 80°." (R. 116.)[1] An x-ray of Jones's left knee was normal. (R. 117.) In addition, Jones was "oriented and alert" and her "[g]ross memory [was] intact." (R. 116.) Dr. Glibi's final assessment was that Jones had a history of diabetes mellitus, which was "[p]oorly controlled with medication"; a history of joint pains with "mild functional deficit present" anemia; and psychiatric disorder. (R. 117.) Dr. Glibi advised Jones to follow-up with a primary care physician, and referred her for a psychiatric examination. (*Id.*)

On July 1, 1994, Dr. Joseph Grossman of K–M.D. Management Services Inc. examined Jones. (R. 132–35.) In the patient history section of his report, Dr. Grossman recorded that Jones "describe[d] a history of diabetes for 22 years [for which she] presently takes NPH," "a history of hypertension for 20 years [for which she] presently takes Capoten [and has] intermittent headaches or dizziness," "a history of joint pains for 3 years [with] pain in left knee," "a history of anemia for 6 years," and "a history of psychiatric disorder [which she] describes being significantly depressed." (R. 132–33.) Dr. Grossman noted that Jones was hospitalized at Bronx–Lebanon for diabetes problems and hospitalized at Our Lady of Mercy in 1991 for a suicide attempt. (R. 133.)

Dr. Grossman diagnosed Jones with a "[h]istory of diabetes mellitus, on Insulin, with mild peripheral neuropathy"; a "[h]istory of hypertension with mild systolic elevation at present"; a "[h]istory of joint pains, with disorder of left knee evident"; a "[h]istory of anemia, not clinically correlated"; and a "[h]istory of psychiatric disorder, with past suicidal effort." (R. 135.) Dr. Grossman determined Jones's functional assessment as "physically ... mildly impaired for repeated vigorous bending, stooping and crouching." (*Id.*) Dr. Grossman recommended a psychiatric evaluation, and his general prognosis was "fair." (*Id.*)

On April 18, 1995, Dr. Steven Rocker of Diagnostic Health Services, Inc. examined Jones. (R. 143–45.) Dr. Rocker noted that Jones was depressed after her son was murdered 5 years ago, and had "suicidal ideation in the past, but not current-

---

1. On March 8, 1994, Dr. Rocco Bevilacqua examined Jones's left knee and found no "deformities to indicate either recent or old fracture, dislocation or periosteal injury." (R. 118.) There were also "no significant arthritic changes. No other bone or joint pathology .... The soft tissue present[ed] no gross abnormalities ." (*Id.*) Dr. Bevilacqua concluded that the studies were normal roentgenographically. (*Id.*)

On July 1, 1994, radiologist Dr. Alan Berlly x-rayed Jones knee and also found "[n]o fracture, effusion, osteoarthritic changes. Soft tissues are unremarkable." (R. 136.) Dr. Berlly's impression was of a "[n]ormal examination of the left knee." (*Id.*)

On April 18, 1995, radiologist Dr. Joseph Gottesman examined an x-ray of Jones's left knee and found "no evidence of acute fracture, dislocation of destructive bony lesion. The joint spaces are well maintained. Calcification of the patellar ligament is noted." (R. 146.) Dr. Gottesman's impression was "[l]igamentous calcification." (*Id.*)

ly." (R. 143.) Dr. Rocker also noted that Jones "arrived [at] the examination by bus accompanied by a friend," and that "[s]he does not travel by herself on public transportation because she is afraid to." (*Id.*) Like the other consulting doctors, Dr. Rocker found Jones's gait normal, and Jones had no difficulty "getting on and off the examining table." (R. 144.) In contrast to the other doctors, however, Dr. Rocker found that all of Jones's joints "had full range of motion without deformities, without swelling, warmth or tenderness. No joint instability. No muscular atrophy." (*Id.*) Dr. Rocker's impressions were that Jones had a "[h]istory of diabetes mellitus (type 1)"; "[p]eripheral neuropathy secondary to 1"; [h]ypertension—well-controlled on current medication; "[h]istory of anemia," and "[h]istory of possible depression." (R. 145.) Dr. Rocker concluded that Jones "would probably have difficulty with activity requiring repetitive strength or dexterity of lower extremities." (*Id.*) His prognosis was "fair." (*Id.*)

### 3. *Consultative Psychiatric Examinations*

On March 8, 1994, Dr. Edward Vadeika performed a consultative psychiatric evaluation of Jones. (R. 119–121.) Dr. Vadeika noted that Jones "has a history of chronic depression of approximately four years' duration [and] complains of feeling extremely depressed all of the time." (R. 119.) Jones had "experienced paranoid ideation and hallucinations. She reported often hearing unreal voices and believing she was being watched/followed." (*Id.*) Jones also had "recurring thoughts of suicide" and had attempted suicide once four years before. (*Id.*) Jones had received outpatient psychiatric therapy for a year or two. (*Id.*) Jones's "Mental Status Exam" revealed that:

> Her responses to the questions asked seem sincere. The level of activity is normal. Ms. Jones is groomed, clean and neatly dressed.

Eye contact is normal. Overall, the client is fairly well-related. She speaks at a normal rate and volume. Speech production is normal; the form is coherent and goal-directed with no looseness of associations. Responses to questions asked are pertinent. The client expresses the paranoid idea that she is watched or followed by others. *The mood is depressed* and the affect of normal range and mood congruent. *Ms. Jones admits to thinking about suicide at times.*

(R. 120, emphasis added.) Jones's cognitive examination showed that she was "oriented," with average intelligence, unimpaired concentration, unimpaired immediate recall, and normal language comprehension. (*Id.*)

Dr. Vadeika's opinion of Jones's functional assessment was that:

> Jones is independently able to take care of grooming and hygiene, maintain a residence, and manage finances but unable without assistance to use public transportation. *Her ability to interact in a socially acceptable manner in a workplace setting has been adversely affected by mental illness.*
>
> *The impairments in personal and social functioning described in the history are consistent with client's presentation during today's evaluation, which shows a depressed mood, paranoid ideation, psychotic symptomatology and poor reality-testing.*

(*Id.*, emphasis added.) Dr. Vadeika diagnosed Jones with "[m]ajor depression" and diabetes mellitus. (R. 121.) His prognosis was that Jones "has been markedly impaired for several years, in spite of treatment, and substantial improvement in the near future would be unlikely. This client is competent to handle her funds and benefit payments...." (*Id.*)

On July 1, 1994, Dr. A. DeLaChapelle from K–M.D. Management Services conducted a consultative psychiatric examination of Jones. (R. 130–32.) Jones told him that she was "suffering from depression since her son was murdered in 1990."

(R. 130.) Dr. DeLaChapelle noted that until July 1993, Jones had been seen by Dr. Jungbult at the Soundview Mental Health Clinic, where she received Visterol 25 mg b.i.d. and 50 mg of hs "with good improvement in her symptoms of depression and sleeplessness." (*Id.*) Jones had not had any psychiatric treatment since then. (*Id.*) He also noted that Jones reported "she [was] unable to do most household chores most days because of her depression and depends on friends and relatives to help her out." (R. 131) Dr. DeLaChapelle found Jones's mental status was "alert, cooperative," and her "[s]peech was coherent and relevant with no obvious thinking disorder." (R. 130.) Jones "seemed mildly anxious and depressed but was not hallucinating, delusional, paranoid or referential." (*Id.*) Like Dr. Vadeika, Dr. DeLaChapelle found Jones's intellectual functioning was "in the average range," her "[m]emory was intact," "[i]nsight and judgment fair," and she was "oriented to time, place and person." (*Id.*) Dr. DeLaChapelle opined that Jones could manage her own funds, and had "a satisfactory ability to understand, carry out and remember instructions and a satisfactory ability [to] respond appropriately to supervision, co-workers and work pressures in a work setting." (R. 131.) He diagnosed Jones with "[d]ysthymic disorder." (*Id.*) Dr. DeLaChapelle's prognosis was that Jones "might benefit from psychiatric treatment. Prognosis fair." (*Id.*)

On April 18, 1995, Dr. Solomon Miskin of Diagnostic Health Services, Inc. conducted a consultative psychiatric evaluation of Jones. (R. 140–42.) Dr. Miskin noted that Jones was on "a number of medications including Capoten, Iron Sulfate, Corven and Hydroxyzine." (R. 140.) Jones reported to Dr. Miskin that she rarely goes out alone, and has a friend who helps her with housekeeping, cooking, cleaning, shopping and laundry. (*Id.*) Dr. Miskin assessed Jones's mental status as

alert and oriented in all spheres. She is friendly, cooperative, coherent and compliant. Speech is clear. Response time is good. Comprehension is good. . . . There is no overt evidence for a thought disorder. Affect is expressive and appropriate as well as normal in depth and degree. Mood appears to be generally stable, friendly and cooperative. There is some dysthymia and mild to moderate melancholia.

Sensorium and intellectual function show the claimant's concentration and attention span to be grossly unremarkable . . . . She is able to count backwards from 20 slowly and with poor accuracy. Memory . . . appear[s] to be grossly intact. . . . Fund information is fair.

(R. 141.) Dr. Miskin opined that Jones "shows from a psychiatric perspective, a satisfactory ability to understand, carry out and remember instructions and a satisfactory ability to respond to appropriate supervision, co-workers and work pressures in a work setting. Adaptability and stress tolerance are fair." (*Id.*) Dr. Miskin diagnosed Jones with "[d]ysthymic disorder, moderate severity, chronic," "[i]nsulin dependent diabetes mellitus; anemia unspecified type; and hypertension," and "[m]oderate active medical symptoms." (R. 142.) Dr. Miskin deemed Jones's prognosis "[u]ncertain to fair." (*Id.*) As to treatment, he suggested that "[t]here appears to be no acute need for psychiatric or psychological intervention at this time." (*Id.*)

### 4. *Functional Assessments*

On August 12, 1994, Dr. G. Kleinerman reviewed Jones's medical reports and prepared a "Residual Physical Functional Capacity Assessment" and a "Psychiatric Review." (R. 45–62.) Dr. Kleinerman diagnosed Jones primarily with diabetes and secondarily with dysthymic disorder. (R. 45, 46.) Dr. Kleinerman determined that Jones could occasionally lift and/or carry up to 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk about 6 hours in an 8–hour workday, sit for a total of about 6 hours in an 8–hour workday, and her ability to

push and/or pull was unlimited. (R. 47.) Dr. Kleinerman determined that Jones could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 48.) Dr. Kleinerman found Jones had no manipulative, visual, communicative or environmental limitations. (R. 49–50.) Dr. Kleinerman concluded that Jones had a residual functional capacity for sedentary work. (R. 52.) Dr. Kleinerman evaluated Jones' psychiatric impairments as not severe. (R. 54.) He found that Jones had no evidence of organic mental disorders, schizophrenic, paranoid and other psychotic disorders, mental retardation or autism, anxiety related disorders, somatoform or personality disorders, or substance addiction. (R. 56–60.) He did find that Jones had an affective disorder with "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by a ... [d]ysthymic disorder." (R. 54, 57.)

On May 10, 1995, Dr. H. Porter also reviewed Jones's medical records and prepared a "Residual Functional Capacity Assessment." (R. 68–76.) Dr. Porter's primary diagnosis also was diabetes mellitus and neuropathy, and his secondary diagnosis was dysthymic disorder, "Anxiety Related Disorder/Functional Nonpsychotic." (R. 68, 69.) Dr. Porter determined that Jones could occasionally lift/and or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8–hour workday, sit about 6 hours in an 8–hour workday, and that Jones's ability to push and/or pull was limited to 20 pounds in her upper extremities. (R. 70.) Like Dr. Kleinerman, Dr. Porter determined that Jones could occasionally climb, balance, stoop, kneel, crouch and crawl, and that Jones had no manipulative, visual, communicative or environmental limitations. (R. 72–73.)[2]

## C. *The ALJ's Decision*

On March 15, 1996, a little over a month after the hearing, the ALJ sent Jones a letter stating that he had not received the medical reports from her treating physicians:

I write to you in follow up to your hearing for [SSI] benefits that was held before me on February 12, 1996.

After the hearing you were given medical reports and residual functional capacity assessments for: 1) Bronx–Lebanon Hospital (Dr. Walsh), 2) Bronx Mental Health (Fulton Clinic), and 3) Soundview Medical Center (Dr. Coven).

I have not received the medical reports or the assessments from any of these sources.

I will wait an additional ten days for you to obtain reports and assessments from these sources. After the ten days, I shall proceed to issue my decision.

Please contact my office if you have any questions concerning this matter.

(R. 160.)

On June 20, 1996, the ALJ issued his written decision. (R. 9–16.) Although the ALJ did not receive any records from Jones's treating physicians, he determined that "the record contains ample medical evidence and that a decision can be made as to whether [Jones] is disabled." (R. 12.) The ALJ concluded that Jones "has a severe impairment or combination of impairments but retains the residual functional capacity to return to the work she performed in the past." (R. 12.) The ALJ also found that none of Jones's impairments met or equaled the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (R. 13, 16.) Specifically, the ALJ found that the "evidence supports a finding that Ms. Jones

---

**2.** Jones attached to her complaint a new psychological evaluation from Dr. Udasco of Bronx–Lebanon Hospital, dated December 12, 1997, concluding that Jones suffers from an "affective disorder" that leaves her moderately to markedly limited in understanding, memory, concentration, social interaction and adaptation. (Cplt. Ex. 1: 12/12/97 Udasco Report.) Because I recommend that the case be remanded to the Commissioner, the Court need not consider this evidence or address whether it is even appropriate to consider.

has diabetes, depression and hypertension, impairments which cause significant vocationally relevant limitations." (R. 13.) The ALJ reviewed the clinic notes from Bronx–Lebanon, which the ALJ asserted showed that Jones had "insulin dependent diabetes which is controllable if she complies with her prescribed medication. Similarly, [Jones's] blood pressure is controlled with medication. Anemia is treated with iron supplements.... Consultative examinations of record also support the conclusion that the claimant was not disabled." (Id.)

The ALJ referred to Dr. Glibi's examination which "revealed that [Jones's] blood pressure was within normal limits." (Id.) The ALJ also stated that Dr. Glibi reported no swelling of Jones's extremities, and Dr. Glibi observed that Jones walked normally, dressed herself and got on and off the examination table without difficulty. (Id.) The ALJ found that although Jones complained of knee pain, "radiological studies failed to reveal any pathology," and that Jones took Tylenol for the pain. (Id.)

The ALJ also relied upon the July 1, 1994 consultative examination of Dr. Grossman at which Jones stated that she was not undergoing psychiatric treatment, and although she said she had taken medication for depression, she stopped the medication and the treatment. (R. 13–14.) The ALJ also stated that physically, according to Dr. Grossman, Jones's joints and spine were normal, and again that she had no problem dressing or getting on or off the examination table. (R. 14.) In addition, the ALJ noted that Dr. Grossman assessed that Jones was "mildly impaired for repeated vigorous bending, stooping and crouching," which is consistent with the ability to perform medium work activity. (Id.)

Regarding Jones's psychiatric evaluations, the ALJ found that although the "record contains indications of depression ... there [had] been no treatment for depression during the period covered by [Jones's] application, i.e., from March 1994." (Id.) The ALJ looked at Dr. Vadeika's psychiatric report and found that Jones's speech and cognitive functions were normal. (Id.) The ALJ noted that even though Jones told Dr. Vadeika that she felt depressed, during the interview with Dr. Vadeika, Jones's "affect did not appear depressed, she did not exhibit difficulty concentrating and the conversation did not reflect that she [had] a psychological impairment which causes significant limitations on her ability to work. Thus, while generally concluding that [Jones] was markedly impaired, no specific assessment of work related abilities was made and the clinic findings reported do not lead to the conclusion that such are present." (Id.)

The ALJ found that Dr. DeLaChapelle's consultative examination identified "no significant functional limitations." (Id.) The ALJ also found that although Dr. Urbano "noted a marked psychiatric impairment," "the results of a mental status examination were not reported; the clinical evaluation dealt with [Jones's] physical status. Thus, the opinion concerning [Jones's] mental status cannot be credited." (Id.) In addition, the ALJ relied upon Jones's most recent mental examination, by Dr. Miskin. (Id.) Again, Jones's "speech was fine, her mood was stable and she was friendly and cooperative." (Id.) The ALJ remarked that Dr. Miskin found that Jones could relate to co-workers, respond to supervision, and handle work pressure (id.), and concluded that "[t]his most recent report, based upon a detailed examination and noting further the absence of treatment, leads to the conclusion that the claimant does not have a mental impairment which significantly limits the range of work she can perform, i.e., there is no severe mental impairment." (R. 15.)

The ALJ found that Jones's impairments were controllable with medication, and that her course of treatment "cannot be described as intensive and she [had] not required any extensive workup." (Id.) Finally, the ALJ found that "at the hearing, although such one time observations are

entitled to little probative value, [Jones] was in no apparent distress or discomfort." (*Id.*)

The ALJ concluded that Jones could perform medium work including her former work as a home attendant. (*Id.*) The ALJ noted that at the hearing Jones said that as a home attendant she had to lift an elderly lady, but in an earlier, more specific report, Jones said that no lifting was necessary. (R. 15 n.1.) The ALJ also found that in the alternative, if Jones could not return to her past occupation, she could do light work and given her age, education and residual functional capacity, she should be able to find another job. (R. 15–16.)

### D. *Medical Evidence Submitted to the Appeals Council*

Dr. Walsh of Bronx–Lebanon Hospital Center submitted a report dated August 14, 1996 to the Appeals Council. (R. 161–68.) Dr. Walsh reported that a physical examination of Jones on August 9, 1996 was normal except for an enlarged liver and anemia. (R. 163.) Dr. Walsh diagnosed Jones with weight loss and an enlarged liver, and referred Jones for a gastro-intestinal evaluation. (R. 163, 165.) Dr. Walsh found that Jones's impairments did not affect her ability to stand or walk or to lift or carry; Jones could occasionally carry up to 20 pounds a day. (R. 166.) Dr. Walsh found that Jones could sit a total of 8 hours a day and 3 hours without interruption. (R. 167.) Dr. Walsh found that Jones could occasionally climb, kneel, crouch, stoop, balance and crawl; and that her impairments did not affect her ability to reach, handle, see, speak, feel, push/pull or hear. (*Id.*) The only environmental limitation Dr. Walsh assessed was temperature extremes due to Jones's anemia. (R. 168.)

### *ANALYSIS*

### I. *APPLICABLE LEGAL STANDARDS*

#### A. *The Definition of Disability*

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see, e.g., Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Vega v. Commissioner of Soc. Sec.,* 97 Civ. 6438, 1998 WL 255411 at \*5 (S.D.N.Y. May 20, 1998) (Peck, M.J.); *Pickering v. Chater,* 951 F.Supp. 418, 422 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.); *Burris v. Chater,* 94 Civ. 8049, 1996 WL 148345 at \*2 (S.D.N.Y. April 2, 1996); *DeJesus v. Shalala,* 94 Civ. 0772, 1995 WL 812857 at \*4 (S.D.N.Y. June 14, 1995) (Peck, M.J.), *report & rec. adopted,* 899 F.Supp. 1171 (S.D.N.Y.1995); *Francese v. Shalala,* 897 F.Supp. 766, 769 (S.D.N.Y.1995); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at \*6 (S.D.N.Y. Sept.26, 1995) (Kaplan, D.J. & Peck, M.J.); *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995). The combined effect of all impairments must be of such severity that the person

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); *see, e.g., Rosa v. Callahan,* 168 F.3d at 77; *Balsamo v. Chater,* 142 F.3d at 79; *Vega v. Commissioner of Soc. Sec.* 1998 WL 255411 at \*6; *Pickering v. Chater,* 951 F.Supp. at 422–23; *Burris v. Chater,* 1996 WL 148345 at \*2; *DeJesus v. Shalala,* 1995 WL 812857 at \*4; *Walzer v. Chater,* 1995 WL 791963 at \*6.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam); *see also, e.g., Brown v. Apfel,* No. 98–6128, 1999 WL 183758 at *3 (2d Cir. April 1, 1999); *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983); *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *6; *Pickering v. Chater,* 951 F.Supp. at 423; *Walzer v. Chater,* 1995 WL 791963 at *6; *DeJesus v. Shalala,* 1995 WL 812857 at *4.

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Rosa v. Callahan,* 168 F.3d at 77; *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Perez v. Chater,* 77 F.3d at 46; *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler,* 722 F.2d at 1038; *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir.1983); *Fernandez v. Apfel,* 97 Civ. 6936, 1998 WL 603151 at *7 (S.D.N.Y. Sept.11, 1998) (Peck, M.J.); *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at*6; *Pickering v. Chater,* 951 F.Supp. at 423; *Burris v. Chater,* 1996 WL 148345 at *2; *Walzer v. Chater,* 1995 WL 791963 at *6; *Francese v. Shalala,* 897 F.Supp. at 770; *Coleman v. Shalala,* 895 F.Supp. at 54; 42 U.S.C. § 405(g). "Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." *Burris v. Chater,* 1996 WL 148345 at *3; *see also, e.g., Fernandez v. Apfel,* 1998 WL 603151 at *7; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at*6; *Francese v. Shalala,* 897 F.Supp. at 770.

The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *accord, e.g., Tejada v. Apfel,* 167 F.3d 770, 773–74 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d at 77; *Perez v. Chater,* 77 F.3d at 46; *Fernandez v. Apfel,* 1998 WL 603151 at *8; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *6; *Pickering v. Chater,* 951 F.Supp. at 423; *Walzer v. Chater,* 1995 WL 791963 at *6.

However, the Court will not defer to the Commissioner's determination if it is " 'the product of legal error.' " *E.g., Fernandez v. Apfel,* 1998 WL 603151 at *8; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at*6; *Burris v. Chater,* 1996 WL 148345 at *3; *Francese v. Shalala,* 897 F.Supp. at 770.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). The Second Circuit has articulated the five steps as follows:

[1] First, the Secretary [now, Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. [2] If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his

past work. [5] Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *accord, e.g., Brown v. Apfel,* 174 F.3d 59, 1999 WL 183758 at *3; *Tejada v. Apfel,* 167 F.3d at 774; *Rosa v. Callahan,* 168 F.3d at 77; *Balsamo v. Chater,* 142 F.3d at 79–80; *Schaal v. Apfel,* 134 F.3d at 501; *Perez v. Chater,* 77 F.3d at 46; *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir. 1995); *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *7; *Pickering v. Chater,* 951 F.Supp. at 423; *Burris v. Chater,* 1996 WL 148345 at *2; *Walzer v. Chater,* 1995 WL 791963 at *6; *DeJesus v. Shalala,* 1995 WL 812857 at *4; *Francese v. Shalala,* 897 F.Supp. at 769; *Coleman v. Shalala,* 895 F.Supp. at 53–54.

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that she cannot return to her past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only her medical capacity but also her age, education and training. *See, e.g., Rosa v. Callahan,* 168 F.3d at 80; *Perez v. Chater,* 77 F.3d at 46; *Berry v. Schweiker,* 675 F.2d at 467; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *7; *Pickering v. Chater,* 951 F.Supp. at 423; *Burris v. Chater,* 1996 WL 148345 at *3; *Walzer v. Chater,* 1995 WL 791963 at *7; *DeJesus v. Shalala,* 1995 WL 812857 at *5; *Francese v. Shalala,* 897 F.Supp. at 770.

### B. The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *see also, e.g., Rosa v. Callahan,* 168 F.3d 72, 78–79 (2d Cir.1999); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998); *Vega v. Commissioner of Soc. Sec.,* 97 Civ. 6438, 1998 WL 255411 at *7–8 (S.D.N.Y. May 20, 1998) (Peck, M.J.); *Sanchez v. Chater,* 964 F.Supp. 133, 138 (S.D.N.Y.1997); *Toro v. Chater,* 937 F.Supp. 1083, 1091 (S.D.N.Y.1996); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *7 (S.D.N.Y. Sept.26, 1995) (Kaplan, D.J. & Peck, M.J.). Further, the regulations specify that when controlling weight is not given a treating physician's testimony (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such testimony: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); *see also, e.g., Schaal v. Apfel,* 134 F.3d at 503; *Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *8; *Walzer v. Chater,* 1995 WL 791963 at *7. The Commissioner's current "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir.1993); *see also, e.g., Vega v. Commissioner of Soc. Sec.,* 1998 WL 255411 at *8; *Sanchez v. Chater,* 964 F.Supp. at 138; *Walzer v.. Chater,* 1995 WL 791963 at *7.

### II. JONES'S APPLICATION SHOULD BE REMANDED FOR FURTHER PROCEEDINGS BECAUSE THE ALJ FAILED TO ADEQUATELY DEVELOP THE RECORD

A court reviewing an SSI denial "must first satisfy [itself] that the claimant has

had a 'full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (quoting *Gold v. Secretary of Health, Educ. & Welfare,* 463 F.2d 38, 43 (2d Cir.1972)); *see also, e.g., Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990); *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980); *Vaughn v. Apfel,* 98 Civ. 0025, 1998 WL 856106 at \*6 (S.D.N.Y. Dec.10, 1998); *Prentice v. Apfel,* 11 F.Supp.2d 420, 425 (S.D.N.Y.1998); *Dawson v. Apfel,* 96 Civ. 6023, 1997 WL 716924 at \*7 (S.D.N.Y. Nov. 17, 1997); *Rodriguez v. Apfel,* 96 Civ. 1132, 1997 WL 691428 at \*4 (S.D.N.Y. Nov. 4, 1997).

"Moreover, '[i]t is the rule in our circuit that "the ALJ, unlike a judge in a trial, must … affirmatively develop the record," in light of "the essentially non-adversarial nature of a benefits proceeding."'" *Tejada v. Apfel,* 167 F.3d 770, 774–75 (2d Cir.1999); *accord, e.g., Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999); *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996); *Cruz v. Sullivan,* 912 F.2d at 12; *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 755; *Mejias v. Apfel,* 96 Civ. 9680, 1998 WL 651052 at \*5 (S.D.N.Y. Sept. 23, 1998); *Maestre v. Apfel,* 96 Civ. 8273, 1998 WL 477950 at \*4 (S.D.N.Y. Aug. 13,1998); *Prentice v. Apfel,* 11 F.Supp.2d at 425; *Dawson v. Apfel,* 1997 WL 716924 at \*7; *Rodriguez v. Apfel,* 1997 WL 691428 at \*4.

Where a claimant appears at the hearing pro se, as Jones did, the ALJ "is under a heightened duty to '"scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."'" *Cruz v. Sullivan,* 912 F.2d at 11; *accord, e.g., Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 755; *Hankerson v. Harris,* 636 F.2d at 895; *Gold v. Secretary of Health, Educ. & Welfare,* 463 F.2d at 43; *Vaughn v. Apfel,* 1998 WL 856106 at \*6; *Mejias v. Apfel,* 1998 WL 651052 at \*5; *Maestre v. Appel,* 1998 WL 477950 at \*4; *Prentice v. Apfel,* 11 F.Supp.2d at 425; *Dawson v. Apfel,* 1997 WL 716924 at \*7;

*Rodriguez v. Apfel,* 1997 WL 691428 at \*4; *Mann v. Chater,* 95 Civ. 2997, 1997 WL 363592 at \*3 (S.D.N.Y. June 30, 1997) (Sotomayor, D.J.).

The ALJ is thus obligated to explore the facts by obtaining relevant medical records and asking questions of a pro se claimant to assist the claimant in developing her case. *See, e.g., Rosa v. Callahan,* 168 F.3d at 80 (ALJ required to request additional records from physicians); *Perez v. Chater,* 77 F.3d at 47 (ALJ required to make "'every reasonable effort to help [the claimant] get medical reports from [her] own medical sources.'") (quoting 20 C.F.R. § 404.1512(d)); *Cruz v. Sullivan,* 912 F.2d at 11 (ALJ required to obtain hospital records and ask plaintiff about his asthma attacks); *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 755–56 (ALJ failed to explore claimant's subjective complaints or obtain necessary medical records); *Mejias v. Apfel,* 1998 WL 651052 at \*5 (ALJ required to help claimant get her medical records); *Maestre v. Appel,* 1998 WL 477950 at \*4 (ALJ "obligated to explore the facts by asking questions of and obtaining relevant medical records from pro se claimants").

The ALJ's responsibility to assist a claimant in obtaining her medical records carries particular importance in light of the well-established treating physician rule, which requires an ALJ to grant special deference to the opinions of a claimant's treating physicians. (*See* pages 27–28 above.) As Judge Glasser explained:

[T]hese two principles—the duty to develop a full record and the treating physician rule—do not operate independently of each other.... [T]he duty to develop a full record and to assist a pro se plaintiff compels the ALJ … to obtain from the treating source expert opinions as to the nature and severity of the claimed disability.... Thus, when the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ

make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.... Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties to the pro se claimant under the treating physician rule.

*Peed v. Sullivan,* 778 F.Supp. 1241, 1246 (E.D.N.Y.1991); *see also, e.g., Mejias v. Apfel,* 1998 WL 651052 at *6; *Almonte v. Apfel,* 96 Civ. 1119, 1998 WL 150996 at *7 (S.D.N.Y. March 31, 1998); *Rodriguez v. Apfel,* 1997 WL 691428 at *5. To achieve this goal, an ALJ is authorized to issue subpoenas requiring the production of any evidence relating to a matter under his or her consideration. *See, e.g.,* 42 U.S.C. § 405(d) ("For the purpose of any hearing ... authorized or directed under this subchapter, or relative to any other matter within the Commissioner's jurisdiction hereunder, the Commissioner of Social Security shall have power to issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation or in question before the Commissioner."); *Treadwell v. Schweiker,* 698 F.2d 137, 141 (2d Cir.1983); *Mejias v. Apfel,* 1998 WL 651052 at *6; *Carroll v. Secretary of Health & Human Servs.,* 872 F.Supp. 1200, 1204 (E.D.N.Y.1995).

In this case, the ALJ failed in his duty to assist Jones in obtaining the medical records and opinions of three of her treating sources: Dr. Walsh from Bronx–Lebanon Hospital, Bronx Mental Health (Fulton Clinic), and Dr. Coven from Soundview Medical Center. The ALJ left it entirely up to Jones to procure her treating physician medical records, even though the ALJ knew from the record that Jones had a

psychological disorder. (*See* pages 14–17 above.) The ALJ also saw for himself that Jones had problems following instructions and got confused when she asked for an attorney at the hearing, and gave confusing answers about who treated her and when. (R. 20–21, 24–25.) The Social Security Administration's own rules state that it is the Administration's responsibility to *"make every reasonable effort* to help [a claimant] get medical reports from [her] own medical sources when [the claimant] give[s] [the Administration] permission to request the report." 20 C.F.R. § 404.1512(d) (emphasis added). The regulation defines "every reasonable effort" as *"we will make an initial request for evidence from your medical source* and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, *we will make one follow up request to obtain the medical evidence necessary to make a determination."* 20 C.F.R. § 404.1512(d)(1) (emphasis added).

The ALJ here never offered to subpoena Jones's medical records for her, or even to try to obtain the records for her from the treating physicians.[3] Further, the ALJ did not explain why the medical records were necessary, or that he was planning to rule against Jones and that she needed to produce evidence from her treating physicians to convince him otherwise. *See, e.g., Cruz v. Sullivan,* 912 F.2d at 12 (ALJ failed to develop the record where ALJ failed to tell plaintiff of his skepticism of his doctor's claim, even though ALJ sent a letter to plaintiff's treating physician requesting more information; "[h]ad [plaintiff] been apprised of the ALJ's skepticism, he, unlike the ALJ, may have been persistent about obtaining his medical records and a detailed statement from [his treating doctor]."); *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 756

---

**3.** Although the Second Circuit has suggested that an ALJ can satisfy his duty to develop the record by telling a claimant to obtain her own medical records, in none of those cases did the claimant complain of psychological (as

opposed to physical) problems. *See, e.g., Rosa v. Callahan,* 168 F.3d at 80; *Cruz v. Sullivan,* 912 F.2d at 12; *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d at 756.

(" 'basic principles of fairness require that [the ALJ] inform the claimant of his proposed action and give him an opportunity to obtain a . . . detailed statement [from his treating physician]' ") (quoting *Hankerson v. Harris*, 636 F.2d at 896); *Mejias v. Apfel*, 1998 WL 651052 at *6; *Vazquez v. Apfel*, 97 Civ. 5370, 1998 WL 542324 at *4 (S.D.N.Y. Aug. 24, 1998); *Almonte v. Apfel*, 1998 WL 150996 at *7 (ALJ failed to develop the record where the ALJ did not make a sufficient effort to obtain records from plaintiff's treating physicians; "[p]ossible avenues the ALJ could have pursued included a subpoena, enforcement of the subpoena, and advice to the plaintiff of the importance of the evidence"); *Flanders v. Chater*, 93 Civ. 5671, 1995 WL 608287 at *8 (S.D.N.Y. Oct. 17, 1995); *Carroll v. Secretary of Health & Human Servs.*, 872 F.Supp. at 1204; *Santiago v. Schweiker*, 548 F.Supp. 481, 486 (S.D.N.Y.1982).

Nor did the ALJ tell Jones that she could subpoena the testimony of her treating physicians if she was unable to obtain her medical records (or in addition to obtaining her medical records). *See, e.g., Mejias v. Apfel*, 1998 WL 651052 at *6 (ALJ did not develop the record where he "did not consider exercising his authority to issue subpoenas, and at no point did he inform plaintiff that she should—or even could—produce additional evidence or call her treating physicians as witnesses"); *Mann v. Chater*, 1997 WL 363592 at *5 (ALJ failed to assist plaintiff in developing the record because, *inter alia*, " 'before denying a pro se claimant's application, the ALJ should advise the claimant that "he considered [her] case unpersuasive, and . . . suggest that [she] produce additional medical evidence or call [. . . her treating physician] as a witness" ' " and the ALJ "did not advise plaintiff to attempt to find and call her treating physician to testify regarding . . . her disability"); *Rodriguez v. Apfel*, 1997 WL 691428 at *4 ("This heightened obligation to scrupulously develop the record in pro se cases involves, *inter alia*, the duty to insure that the claimant secures all of the relevant medical

testimony; the duty to call the claimant's physicians to testify; and the duty to instruct the claimant of his right to subpoena and cross-examine physicians."); *Santiago v. Schweiker*, 548 F.Supp. at 486 (ALJ erred in relying on doctor's report "without at least alerting the claimant to her power to subpoena and cross-examine the doctor").

The Commissioner nevertheless argues that Jones testified that she was treated at Soundview primarily for diabetes, and the treatment notes from Bronx–Lebanon from 1994 provide substantial evidence for the ALJ's finding that Jones's diabetes did not cause significant functional limitations. (Commissioner Reply Br. at 2–3.) Firstly, even if Jones said she was only treated for diabetes at Soundview, the medical records before the ALJ showed that Jones was seen by Dr. Jungbult at the Soundview Mental Health Clinic until July 1993. (R. 130.) Secondly, the Bronx–Lebanon records consist of physician's notes, and are not opinions of how Jones's diabetes affected her ability to work. Moreover, Jones testified that she had been seeing Dr. Coven at Soundview since 1979, and was still seeing him in 1994 and 1995 (R. 24–25), whereas the Bronx–Lebanon records are scanty and only cover February to April 1994 (R. 123–29), a mere three months out of Jones's SSI period which she alleges began on January 1, 1994. (Cplt.¶ 4.) Jones's records from Soundview likely would have been more complete and covered her entire disability period.

On this record, Jones was entitled to have her records from Soundview and Bronx Mental Health, as well as her Bronx–Lebanon treating physician's opinion, considered before the ALJ made his decision. *See, e.g., Rosa v. Callahan*, 168 F.3d at 80 (remanding to ALJ where two of plaintiff's doctors "each reported that [plaintiff] had been treated both by an orthopedic surgeon and by a neurologist, but the ALJ took no steps to identify or contact those physicians"); *Pratts v. Cha-*

*ter,* 94 F.3d 34, 38 (2d Cir.1996) (remanding where "[m]uch of [plaintiff's] medical history is missing," and "the medical records that do appear in the record are frequently incomplete ... and provide no coherent overview of [plaintiff's] treatment"); *Vaughn v. Apfel,* 1998 WL 856106 at *7; *Prentice v. Apfel,* 11 F.Supp.2d at 427 (remanding where ALJ "did not elicit information about the nature or severity of plaintiff's depression from plaintiff's doctors (despite the mandate in 20 C.F.R. § 404.1512 that the Administration 'will recontact your treating physician [when] ... the report does not contain all the necessary information ....')"); *Rodriguez v. Apfel,* 1997 WL 691428 at *4–5 (remanding where ALJ "failed to obtain [plaintiff's] original medical reports" and subsequent CT scans); *Flanders v. Chater,* 1995 WL 608287 at *8; *Peed v. Sullivan,* 778 F.Supp. at 1247 (remanded where ALJ obtained treating physicians' notes but did not obtain their opinions on plaintiff's ability to work).

The ALJ also failed to scrupulously develop the record by failing to ask Jones a single question about her psychological impairments. The ALJ merely waited until Jones told him about her joint pain and fainting spells, and then asked her if she had any other complaints. (R. 32.) While Jones stated "that [was] it" (*id.*), the record before the ALJ clearly showed that there was more: Jones stated at the hearing that the prior week she saw a psychiatrist at Bronx Mental Health Services, who prescribed medication "to calm [her] down" (R. 23–24); Jones wrote in her disability claim that she was disabled because of depression (R. 41); and it was abundantly clear from the psychological reports before the ALJ that Jones suffered from depression. (*See* pages 14–17 above.) By failing to ask Jones about her depression and other psychological symptoms at the hearing, and about the mental demands associated with her former job as a health care attendant, the ALJ failed to adequately fulfill his affirmative obligation to assist Jones in developing her case. *See,*

*e.g., Hankerson v. Harris,* 636 F.2d at 895–96 (ALJ erred in not questioning plaintiff about subjective symptoms because, "where the medical record before the ALJ contained a number of references to plaintiff's subjective symptoms, it was particularly important that the ALJ explore these symptoms with plaintiff so that the ALJ could effectively exercise his 'discretion to evaluate the credibility of ... (the) claimant ... (in order to) arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant' "); *Mejias v. Apfel,* 1998 WL 651052 at *7 (remanding where "[l]ess than a page of the hearing transcript consists of questions about plaintiff's subjective symptoms, although the Second Circuit has repeatedly emphasized that a claimant's testimony concerning her pain and suffering 'is not only probative on the issue of disability, but "may serve as the basis for establishing disability ..." ' "); *Maestre v. Appel,* 1998 WL 477950 at *8 (ALJ erred in not asking plaintiff about the limitations a side effect of a medication posed and not asking questions about an indicated possible mental impairment); *Rodriguez v. Apfel,* 1997 WL 691428 at *6–7 (remanding where "ALJ did not adequately explore [plaintiff's] condition or allow him to explain all of his medical problems"); *Mann v. Chater,* 1997 WL 363592 at *6 ("By not questioning plaintiff about her subjective claims ..., the ALJ did not satisfy his duty to assist the plaintiff in developing the record so that all of the elements of proving the plaintiff's disability were available to be considered."); *Welch v. Chater,* 923 F.Supp. 17, 20–21 (W.D.N.Y.1996) (the ALJ improperly concluded that plaintiff could work as a cleaner because "[t]he transcript reveals that there was no inquiry regarding the nature of, and the mental demands associated with, plaintiff's [prior] employment"; "[w]hen the plaintiff's impairment is a mental one, special 'care must be taken to obtain a precise description of the particu-

lar job duties which are likely to produce tension and anxiety ... in order to determine if the claimant's mental impairment is compatible with the performance of such work.' ").

Accordingly, because the ALJ failed to adequately develop the record in reaching his determination of Jones's residual functional capacity, the Court need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence. I recommend that the case be remanded to the Commissioner to further develop the record.[4] As the Second Circuit has explained in similar cases:

> " 'Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the .[Commissioner] for further development .of the evidence.' " .... This case, in our view, is one in which remand for further development of the evidence is the wiser course; .... [T]he extent of [claimant's] injuries was not at all clear, and the ALJ failed to develop the record sufficiently to make any appropriate determination in either direction.

*Rosa v. Callahan,* 168 F.3d at 82–83; *see also, e.g., Hankerson v. Harris,* 636 F.2d at 896 (remand "appropriate due to the ALJ's failure to assist this pro se litigant in securing all of the relevant medical testimony."); *Vaughn v. Apfel,* 1998 WL 856106 at *7; *Mejias v. Apfel,* 1998 WL 651052 at *8; *Maestre v. Appel,* 1998 WL 477950 at *8 (remand necessary, where, *inter alia,* "the Court believes that the record needs to be more fully developed on this issue of a possible mental impairment before a disability determination can be made."); *Prentice v. Apfel,* 11 F.Supp.2d at 427 (remand for "amplification of the record on the limited issue of whether

plaintiff is disabled by depression"); *Welch v. Chater,* 923 F.Supp. at 20–21 (remand for ALJ to develop the record and "also make findings that compare the mental demands of [plaintiff's prior work] with plaintiff's current [mental] capabilities").

## CONCLUSION

For the reasons set forth above, I recommend that because the record is incomplete, the case be remanded to the Commissioner for further fact-finding. I therefore recommend that plaintiff's motion for judgment on the pleadings be granted to the extent of ordering that remand, and that the Commissioner's motion for judgment on the pleadings be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley, 40 Foley Square, Room 234, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Pauley. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89

---

4. Unfortunately, Jones's therapist's records from Soundview appear to have been destroyed. (Vaamonde Decl. ¶ 3.) While this complicates matters, the ALJ on remand can and should exercise his subpoena power to have Jones's treating physicians and psychia-

trists from Soundview testify as to her ability to work during the relevant disability period, and should procure the opinions of her current treating physicians and psychiatrists from Bronx Mental Health and Bronx–Lebanon.

(2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

April 30, 1999.