**Luz PABON, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 02 CIV. 0655(VM).**

United States District Court, S.D. New York.

July 24, 2003.

508

Luz Pabon, Bronx, NY, Pro se.

## DECISION AND ORDER

MARRERO, District Judge.

Luz Pabon ("Pabon"), the *pro se* plaintiff in this matter, commenced this action

pursuant to 42 U.S.C. § 405(g) (" § 405(g)") to review the final determination of the Commissioner of Social Security (the "Commissioner") denying her application for disability benefits. In response, the Commissioner has moved for a remand pursuant to the fourth sentence of § 405(g) (the "Remand Motion"). In a Notice of Motion dated April 26, 2003, Pabon opposed this Remand Motion. For the reasons set forth below, the Remand Motion is GRANTED and the case is REMANDED to the Commissioner for further proceedings consistent with this Decision and Order.

## I. *BACKGROUND*

### A. *PROCEDURAL HISTORY*

Pabon filed an application for Supplemental Security Income ("SSI") benefits on July 30, 1999. (Tr. at 13 and 95.)[1] There, Pabon described her disabling conditions as diabetes, pancreatic problems, hepatitis C, and high blood pressure. (Tr. at 87.) Her application was denied on December 27, 1999, (Tr. at 51), and her request for reconsideration was denied on March 15, 2000. (Tr. at 57.) Pabon subsequently requested a hearing (the "Hearing"), which was conducted before Administrative Law Judge Christopher P. Lee (the "ALJ") on December 18, 2000. (Tr. at 22.)

At the Hearing, Pabon, who was represented by counsel, testified that she could not work due to a variety of medical conditions, including fatigue and dizziness, depression with loss of memory and concentration, insomnia, and lower back pain. (Tr. at 29–42.) The ALJ issued a decision on January 22, 2001, concluding that although Pabon had three "severe impairments" (insulin-dependent diabetes mellitus with peripheral neuropathy, obesity, and major depressive disorder), she retained residual functional capacity (hereinafter "RFC")[2] to perform simple, low-stress sedentary work,[3] and thus was not disabled within the meaning of the Social Security Act. (Tr. at 18–19.) The ALJ's decision became the final decision of the Commissioner on November 8, 2001, when the Appeals Council denied Pabon's request for review. (Tr. at 2.)

On December 18, 2001, Pabon filed this complaint, requesting modification of the Commissioner's decision, or, in the alternative, remand to the Commissioner for reconsideration of the evidence. (Complaint, dated Dec. 18, 2001, at 3.) The Commissioner responded by moving for a remand for further proceedings pursuant to the fourth sentence of § 405(g). In a brief handwritten response, Pabon opposed the Commissioner's motion for a remand, and urged that her case be decided by this Court. (*See* Notice of Motion, dated April 26, 2003, at 1.)

### B. *PABON'S MEDICAL HISTORY*

Born on August 4, 1961, Pabon was thirty-seven years old when she filed her ap-

---

1. "Tr." refers to the transcript of the Administrative Record filed by the Commissioner on August 28, 2002, pursuant to § 405(g).

2. *Regulations promulgated by the Commissioner of the Social Security Administration (the "SSA") define RFC as an individual's ability to do sustained work-related activities in a work setting on a regular and continuing basis, after taking into account the effects of* physical and/or mental limitations. *See* 20 C.F.R. § 416.945; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *1.

3. "Sedentary work" is defined as work involving occasional standing and walking, lifting no more than ten pounds at a time, and occasional lifting and carrying of light objects. *See* 20 C.F.R. § 404.1567(a).

plication for SSI benefits. (Tr. at 49.) Pabon was born in Puerto Rico, and moved to the United States mainland when she was twelve years old. (Tr. at 27.) She is educated through the seventh grade, and claims to be unable to read or write in English or Spanish. (Tr. at 28–29.) Pabon has never worked, (*id.*), and claims to have been unable to work since 1978 due to her various medical conditions. (Tr. at 87.)

The medical record in this case indicates that Pabon has a long history of hypertension, diabetes, chronic pancreatitis, hepatitis C, depression, lower back pain, and alcohol dependence. (Tr. at 15 and 144.) Pabon received treatment for these disorders at St. Barnabas Hospital on an irregular basis from 1993 to 1998, (Tr. at 127–43), and from the Fordham–Tremont Community Mental Health Center (for severe depression) several times between 1991 and 1998, when her treatment was terminated for non-compliance. (Tr. at 164.) Following is a summary of the current medical findings, as reported in the record by Pabon's most recent treating and consulting physicians.

On August 19, 1999, Dr. Weissbart, a specialist in internal medicine, saw Pabon for a consultative examination. (Tr. at 127.) Pabon complained to Dr. Weissbart of constant pancreatic pain, dizziness, vertigo, weakness, and nausea. (*Id.*) However, Pabon's physical examination was essentially normal, and Dr. Weissbart reported that Pabon "is able to perform sedentary light and some moderate work activity." (Tr. at 129.)

On October 14, 1999, Dr. Cicarell, a psychiatrist, saw Pabon for a consultative psychiatric evaluation. (Tr. at 144.) Pabon complained of depression with associated symptoms of difficulty sleeping, erratic appetite, fatigue, loss of interest in activities, crying spells, and suicidal ideation. (*Id.*) A mental status examination showed that Pabon had a depressed mood and affect, with impaired attention and concentration. (Tr. at 145.) Despite Pabon's inability to perform complex calculations and difficulty identifying similarities, Dr. Cicarell found that her overall intellectual functioning was "within normal limits." (*Id.*) Dr. Cicarell diagnosed a dysthymic disorder, (*id.*), and concluded that Pabon "has a limited to fair ability to understand, carry out and remember instructions in a work setting." (Tr. at 146.)

On November 23, 1999, Dr. Matusow saw Pabon for a consultative ophthalmologic examination. (Tr. at 171.) Although Pabon complained of blurred vision, Dr. Matusow found no evidence of diabetic retinopathy, and concluded that Pabon "has no visual disability at the present time." (Tr. at 172.)

On December 22, 1999, Dr. Bortuzzo, a specialist in internal medicine, saw Pabon for a consultative examination. (Tr. at 254.) Dr. Bortuzzo noted decreased peripheral sensation on Pabon's hands and feet consistent with moderate peripheral neuropathy. (Tr. at 256.) Dr. Bortuzzo found Pabon to be "moderately to morbidly obese," (Tr. at 255), with a high blood sugar reading and elevated cholesterol. (Tr. at 257.) Based on this physical examination and on Pabon's history of diabetes, hypertension, and hepatitis C, Dr. Bortuzzo concluded that Pabon "appears to be moderately to markedly impaired for repetitive prolonged carrying, lifting, pushing, pulling, bending, walking, [and] standing." (*Id.*)

From July 28, 2000 through the time of the Hearing in December, 2000, Pabon's primary treating physician was Dr. Allan Hoch. (Tr. at 246.) During this period, Dr. Hoch prescribed medications for Pabon's diabetes, hypertension, and depression, and scheduled a gastroenterology appointment for her Hepatitis C condition. (Tr.

at 249.) On December 10, 2000, Dr. Hoch completed a physical RFC assessment of Pabon, indicating that, due to her deconditioned state, obesity, and low back pain, Pabon could only occasionally lift up to twenty pounds, only occasionally carry up to ten pounds, could sit for eight hours a day (but not for more than two at one time without interruption), stand and walk for no more than three hours in a day, and only occasionally perform fine manipulations with her hands. (Tr. at 250–51.) Dr. Hoch also indicated limitations on Pabon's ability to climb, balance, stoop, crouch, kneel, and crawl, and recommended that she avoid exposure to vibrations, fumes, temperature extremes, noise, chemicals, moving machinery, and heights. (Tr. at 252–53.) Dr. Hoch also noted that if Pabon were to work, 40 hours a week would "be too much for [her] to handle at first," and she would need storage access for her insulin and an area to administer it. (Tr. at 253.) Finally, Dr. Hoch ended his assessment by requesting that the Commissioner also evaluate the recommendation of Dr. Riccardi, Pabon's psychiatrist. (*Id.*)

From October 10, 2000 through the time of the Hearing in December, 2000, Pabon was treated by Dr. Patrizia Riccardi, a psychiatrist at the Montefiore Medical Center, for a major depressive episode. (Tr. at 242.) Dr. Riccardi reported that Pabon manifested symptoms of diminished sleep, weight increase, diminished memory, diminished concentration, poor attention span, depressed mood, anhedonia, and auditory hallucination. (*Id.*) In a medical report completed on December 5, 2000, Dr. Riccardi made the following psychiatric findings: psychomotor retardation, constricted affect, depressed mood, circumstantial thought processes, auditory hallucinations, and paranoid ideation. (Tr. at 243.) The section of the report entitled "Limitations Resulting from Disability" is partially illegible, but clearly makes reference to a "severe recurrent episode of major depression." (*Id.*) Under the section entitled "Impairment in areas of routine daily functioning such as work, social relations, self-care and motivation," Dr. Riccardi reported that "[t]his episode [of major depression], combined with her medical problems, makes Pabon particularly vulnerable to further episode. Daily functioning, *including self care and ability to work is impaired at this point.*" (*Id.* (emphasis added).)

Dr. Riccardi followed this report with a letter dated December 6, 2000, in which, among other things, she noted that Pabon had been on antidepressant medication throughout the treatment period, and had "responded well." (Tr. at 242.) However, Dr. Riccardi reiterated her conclusion from the previous day's report that despite this favorable response to medication, Pabon remained "particularly vulnerable" to further episodes of major depression. (*Id.*)

At the Hearing, Pabon's attorney attempted to relate to the ALJ the substance of a telephone conversation the attorney had with Dr. Riccardi concerning Pabon's ability to work. (Tr. at 44.) After the ALJ excluded this testimony as "not appropriate," (*id.*), Pabon's attorney asked the ALJ whether he wanted the attorney to obtain any further information from Dr. Riccardi. (Tr. at 46.) The ALJ declined this request, noting that the record already contained a report from Dr. Riccardi filed just three weeks prior to the Hearing. (*Id.*) The ALJ also expressed the opinion that no further useful information could be gained from Dr. Riccardi, given that her treating relationship with Pabon was only two months in duration. (*Id.* ("[W]hat more can she provide [based on a relationship of] two months?").) As a result, no further evidence was solicited from Dr. Riccardi concerning Pabon's mental capacity to engage in work-related activities.

## II. DISCUSSION

### A. STANDARD OF REVIEW

█ When deciding an appeal from a denial of disability benefits, the Court first reviews the Commissioner's decision "to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *see Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) ("Failure to apply the correct legal standards is grounds for reversal."); *see also Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.").

█ Next, the Court "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada,* 167 F.3d at 773; *accord Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). The Court carefully considers the entire record, including any conflicting evidence, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Quinones v. Chater,* 117 F.3d 29, 33 (2d Cir.1997) (internal quotations omitted). If the court finds that there is substantial evidence to support the Commissioner's decision after reviewing the record as a whole, that decision "must be upheld." *Martinez v. Massanari,* 242 F.Supp.2d

372, 375 (S.D.N.Y.2003); *accord Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990).

### B. DETERMINATION OF DISABILITY

For SSI benefits purposes, a person is "disabled" if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Furthermore, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

█ In assessing a claim of disability, the ALJ must consider the following factors: (1) objective medical facts and clinical findings; (2) diagnosis and medical opinions of examining physicians; (3) subjective evidence of pain and disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience. *See Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir. 1983); *Morillo v. Apfel,* 150 F.Supp.2d 540, 545 (S.D.N.Y.2001).

█ The SSA has promulgated a five step procedure for evaluating disability claims. *See* 20 C.F.R. § 404.1520. In the Second Circuit, this procedure is implemented as follows: First, the ALJ asks whether the claimant is currently engaged in substantial gainful activity. If not, at step two, the ALJ determines whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. Third, if the claimant suffers a "severe impairment" that is listed in Appendix 1 [4]

---

**4.** "Appendix 1" and "the Appendix" refer to    20 C.F.R. Pt. 404, Subpt. P.App. 1, § 12.00.

of the regulations, there is a presumption of disability. Fourth, if the claimant's "severe impairment" is not listed in Appendix 1, the ALJ determines whether the claimant maintains the RFC to perform the work that she performed prior to the onset of her impairment ("past work"). Finally, at step five, if the claimant is unable to perform past work, or has no previous work history, the ALJ ascertains whether there is other work that the claimant is capable of performing. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *Morillo*, 150 F.Supp.2d at 545.

█ The burden lies with the claimant to prove the requirements of the first four steps, but shifts to the Commissioner at step five. *See Berry*, 675 F.2d at 467; *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996); *Aubeuf v. Schweiker*, 649 F.2d 107, 112 (2d Cir.1981) (holding that "[w]hen the claimant has established that his impairment prevents him from returning to his previous employment, the burden shifts to the [Commissioner], who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform," considering not only his physical and mental capability, but also his age, education, experience and training) (citation omitted).

Where a claimant suffers from a mental impairment, SSA regulations require the ALJ to utilize a "special technique" at each step of the administrative review process. 20 C.F.R. § 416.920a(a). At step two of the procedure detailed above, the ALJ must rate the degree of functional limitation resulting from the claimant's mental impairment(s) to determine whether or not they are "severe." *See id.* For this purpose, the claimant's limitations in four "broad functional areas" are rated along a five-point scale ranging from no limitation to extreme limitation. *See id.* § 416.920a(c)(3). The four areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[5] *See id.* A ranking of no or "mild" limitation in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe. *Id.* § 416.920a(d)(1). If the claimant's mental impairment is severe, then at step three the ALJ must determine whether the impairment meets or is equivalent to a listed mental disorder. *See id.* § 416.920a(d)(2). If the claimant is found to have a severe impairment not listed in the Appendix, then, at steps four and five, the ALJ must assess the claimant's mental RFC to determine whether the claimant can meet the mental demands of past relevant work in spite of the limiting effects of her impairment and, if not, whether the claimant can do other work, considering her remaining mental capacities and her occupational base, age, education, and work experience. *See id.* § 416.920a(d)(3); SSR 85–15, 1985 WL 56857 (S.S.A.), at *4.

Where the question at step five is whether the claimant can be expected to perform unskilled work, the SSA regulations clarify that "[t]he basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability. . . ." SSR 85–15, 1985 WL 56857 (S.S.A.), at *4.

---

5. Because these four functional areas are used in Paragraph B of the mental impairment listings in the Appendix, they are often referenced as the "B Criteria."

Before making a final determination according to the five step process outlined above, the ALJ is under an affirmative duty to adequately develop the medical record. *See Tejada*, 167 F.3d at 774; 20 C.F.R. § 416.912(d). The ALJ is thus "obligated to explore the facts by obtaining relevant medical records and asking questions . . . to assist the claimant in developing her case." *Jones v. Apfel*, 66 F.Supp.2d 518, 538 (S.D.N.Y.1999); *see also Perez*, 77 F.3d at 47 (holding that where there are deficiencies in the record, the ALJ is under an affirmative obligation to develop the relevant medical history, "even when the claimant is represented by counsel").

The ALJ's duty to assist a claimant in obtaining her medical records "carries particular importance" in light of the well-established "treating physician rule," which requires the ALJ to grant controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and not inconsistent with other substantial evidence. *Jones*, 66 F.Supp.2d at 538; *see also* 20 C.F.R. § 416.927; *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir.1999); *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998); *Morillo*, 150 F.Supp.2d at 545–46. As one court has explained: "[T]hese two principles—the duty to develop a full record and the treating physician rule—do not operate independently of each other. . . . [T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability. . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." *Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991).

## C. *THE ALJ'S DECISION*

In his January 22, 2001 decision, the ALJ determined that Pabon suffered from three "severe impairments," that these impairments did not match any listed impairment in the Appendix, and that Pabon had no prior work history. (Tr. at 16.) The ALJ thus concluded that Pabon had satisfied the requirements of each of the first four steps of the five-step inquiry described above. (*Id.*) At step five, the ALJ first discussed the evidence in the record relating solely to Pabon's exertional impairments, noting that all of Pabon's consulting and treating physicians were in agreement that Pabon retained the capacity to perform "some type of work." (*Id.*) Based on this evidence, the ALJ concluded that, strictly from an exertional standpoint, Pabon was capable of performing "at least sedentary work." (Tr. at 17.)

The ALJ next proceeded to weigh the medical evidence pertaining to Pabon's mental impairments. Here, the ALJ rated the degree of Pabon's limitations in each of the four functional areas identified by 20 C.F.R. § 416.920a (activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation). (Tr. at 17.) The ALJ concluded that Pabon had only a "mild limitation" in the activities of daily living and social functioning categories. (*Id.*) This decision appears to have been based, not on any medical evidence, but on the fact that the record contains some indications that Pabon at times has assisted with household chores, traveled alone via public transportation, and attended church. (*Id.*) Based largely on Dr. Cicarell's finding of decreased memory and concentration, the ALJ concluded that Pabon had a "moderate limitation" in the area of concentration, persistence, or pace. (*Id.*) Finally, in the category regarding episodes of decompensation, the ALJ noted that Pabon had suf-

fered from two known episodes of major depression, and concluded that her degree of limitation in this area was "one or two."[6] (*Id.*) The findings of Dr. Riccardi, Pabon's current treating psychiatrist, did not figure prominently into this portion of the ALJ's decision. (*See* Tr. at 17.)

Based on the above findings, the ALJ concluded that Pabon's psychiatric limitations "would not significantly erode her occupational base." (Tr. at 18.) According to the ALJ, this conclusion, in conjunction with the earlier finding that Pabon was capable of performing sedentary work, mandated a finding of "not disabled" under the relevant SSA regulations. (*Id.*) Considering the combined effect of Pabon's exertional and non-exertional limitations, the ALJ ultimately concluded that Pabon, while not disabled, "is limited to work involving low stress and requiring only simple, repetitive tasks." (Tr. at 17.)

### D. *ANALYSIS*

The Court is persuaded that the ALJ's determination with regard to Pabon's exertional limitations is supported by substantial evidence. As the ALJ noted in his decision, all of Pabon's consulting and treating physicians were in agreement that Pabon retained the physical capacity to perform at least sedentary work. (Tr. at 16.) In considering Pabon's non-exertional (mental) limitations at step five, however, the ALJ failed to correctly apply the law in two related respects.

First, the ALJ failed to assess Pabon's mental RFC as specified by the relevant SSA regulations. *See* 20 C.F.R. § 416.920a; § 416.945. Those regulations require the ALJ to utilize a "special technique" to determine whether the claimant's mental impairments are "severe." *See* discussion in Section II. B, *supra*, Determination of Disability; § 416.920a.

As discussed above, this technique involves rating the claimant's degree of functional limitation in four broad functional areas. *See id.* Once this determination has been made, however, the ALJ must *then* assess RFC. § 416.920a(d)(3) ("If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.").

Use of the four broad functional categories outlined in § 416.920a to determine whether a claimant's impairments are "severe" is not equivalent to a mental RFC assessment. *See* § 416.920a; SSR 96–8p, 1996 WL 374184 (S.S.A.), at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment...."); *see also* 20 C.F.R. Pt. 404, Subpt. P.App. 1 § 12.00(A) ("An assessment of your RFC complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders when your impairment(s) is severe but neither meets nor is equivalent in severity to a listed mental disorder.").

Mental RFC is assessed according to the provisions of § 416.945, the section of the SSA regulations governing RFC for purposes of SSI benefits, and Social Security Ruling 96–8p, a policy interpretation regarding the assessment of RFC. *See* 20 C.F.R. § 416.945; SSR 96–8p, 1996 WL 374184 (S.S.A.). The latter states that

---

**6.** The "episodes of decompensation" category is ranked according to a four-point scale, ranging from "none" to "four or more" episodes. *See* 20 C.F.R. § 416.920a(c)(4).

mental RFC "*must* be expressed in terms of work-related functions," and specifies the following mental abilities as "work-related": understanding, carrying out, and remembering instructions; using judgment in making work-related decisions; responding appropriately to supervision, co-workers and work situation; and dealing with changes in a routine work setting (hereinafter the "basic work-related mental activities"). SSR 96–8p, 1996 WL 374184 (S.S.A.), at *6 (emphasis added); *see also* 20 C.F.R. § 416.945(c) (listing understanding, remembering, and carrying out instructions in a work setting, and responding appropriately to supervision, coworkers, and work pressures as examples of basic work-related mental activities).

■ The ALJ erred by assessing Pabon's RFC solely at the level of the four broad categories outlined in 20 C.F.R. § 416.920a, without addressing the specific mental demands of unskilled work. (*See* Tr. at 17.) Determining mental RFC "requires a more detailed assessment by itemizing various functions contained in the broad categories." SSR 96–8p, 1996 WL 374184 (S.S.A.), at *4. The particular functions that must be assessed are the basic work-related mental activities specified by the regulations. *See id.* at *6. At step five it is the Commissioner's burden to produce evidence showing that the claimant retains the capacity to perform these functions in a particular work setting. *See Aubeuf,* 649 F.2d at 112; *Martone. v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) ("In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."). By failing to utilize the proper standard to assess Pabon's ability to meet the mental demands of work, the ALJ deprived Pabon of a "full hearing under the [Commissioner's] regulations and in accordance with the benefi-

cent purposes of the [Social Security] Act." *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation omitted).

■ A second and related legal error in the ALJ's decision is his failure to adequately develop the record and accord proper weight to the findings of Pabon's treating psychiatrist, Dr. Riccardi. At step five, the ALJ was required to assess Pabon's ability to perform the basic mental requirements of work. *See* SSR 96–8p, 1996 WL 374184 (S.S.A.), at *6. The medical record in this case is inadequately developed to make such an assessment. Dr. Cicarell, a consulting psychiatrist, diagnosed Pabon with a dysthymic disorder, and concluded that she "has a limited to fair ability to understand, carry out and remember instructions in a work setting." (Tr. at 146.) However, Dr. Cicarell did not express any opinion as to Pabon's ability to perform the other mental requirements of work, such as responding appropriately to supervision and work pressures. (*Id.*)

Dr. Riccardi, Pabon's treating psychiatrist, reported that Pabon's ability to work was impaired, (Tr. at 243), but did not offer any specific assessment of her residual capacity to understand, remember and carry out instructions, respond appropriately to supervision and work pressures, or adapt to changes in a routine work setting. At the Hearing, Pabon's counsel offered to make an effort to obtain further information from Dr. Riccardi regarding Pabon's ability to perform work-related activities. (Tr. at 46.) The ALJ rejected this offer, apparently concluding that the record already included all the information needed from Dr. Riccardi, especially given the fact that Dr. Riccardi's treatment relationship with Pabon was only two months long. (Tr. at 46–47.)

This decision not to pursue additional information from Dr. Riccardi was error

in light of the ALJ's affirmative duty to develop the record and to give proper weight to the opinions of treating physicians. *See Devora v. Barnhart,* 205 F.Supp.2d 164, 172–73 (S.D.N.Y.2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician."); *see also Rosa,* 168 F.3d at 79 (noting that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."). The SSA regulations' description of the duty to develop the medical record is particularly instructive in this regard. The regulations state, in relevant part: "Before we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 416.912(d); *see also Perez,* 77 F.3d at 47. The regulations go on to state that "[w]hen the evidence we receive from your treating physician or psychologist ... is inadequate for us to determine whether you are disabled, ... [w]e will first recontact your treating physician or psychologist ... to determine whether the additional information we need is readily available." § 416.912(e). In light of this duty to develop the medical record, and to accord priority to obtaining information from treating sources, the ALJ erred in failing to re-contact Dr. Riccardi for additional information. This error is especially manifest given that Pabon's counsel offered at the Hearing to acquire such additional information and the offer was rejected. (Tr. at 46.)

## E. *DISPOSITION*

Remand to the Commissioner is the appropriate disposition where, as here, the ALJ incorrectly applied the law and failed to adequately develop the medical record. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.") (citation omitted) (alteration in original); *see also Rosa,* 168 F.3d at 83 (remanding to the Commissioner for further development of the evidence where the ALJ "failed to fulfill her duty in [claimant's] case in several respects.") (internal quotations omitted) (alteration in original); *Devora,* 205 F.Supp.2d at 173 ("Where the ALJ has failed to develop the administrative record, remand for a new hearing is appropriate."); *Welch v. Chater,* 923 F.Supp. 17, 20 (W.D.N.Y.1996) (remanding to the Commissioner for further evidentiary proceedings where ALJ failed to sufficiently develop the record regarding claimant's ability to handle the mental demands of past work).

On remand, the ALJ must further develop the record concerning Pabon's ability to perform work-related activities, in light of her mental impairment. Toward this end, he must make all reasonable efforts to obtain updated treatment records, including a statement from Pabon's treating source about Pabon's ability to handle the mental demands of unskilled, sedentary work. If necessary, the ALJ should arrange for a medical advisor to assist him in evaluating the medical evidence, and a vocational expert to assist him in evaluating Pabon's occupational base in light of the combined effects of her physical and mental impairments. *See* 20 C.F.R. § 416.927(f)(2)(iii); *Rosa,* 168 F.3d at 78 ("[W]here the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform[,] ... the Commissioner must introduce the testimony of a vocational

expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.") (internal quotations omitted). Finally, in light of the fact that Pabon's application for benefits has been pending for more than four years, the Court urges the Commissioner to expedite the proceedings on remand.

## III.  *CONCLUSION AND ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the plaintiff Luz Pabon's request for modification of the Commissioner's decision is GRANTED to the extent she seeks a remand to the Commissioner for reconsideration of the evidence; and it is further

**ORDERED** that the defendant Commissioner's motion for a remand pursuant to sentence four of 42 U.S.C. § 405(g) is GRANTED;  and it is further

**ORDERED** that this case is remanded to the Commissioner of Social Security for further administrative proceedings consistent with this Decision and Order.

This remand is ordered pursuant to sentence four of 42 U.S.C. § 405(g). This Court retains jurisdiction over this case for the enforcement of this Order and any future proceedings with respect to this application.

The Clerk of Court is directed to close this case.

**SO ORDERED.**